IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RAYMOND WEILER : CIVIL ACTION
[AT-0326] :
:
v. :
:
COMMONWEALTH OF PENNSYLVANIA : NO. 08-1984

## REPORT AND RECOMMENDATION

M. FAITH ANGELL                                                    February 5, 2009
UNITED STATES MAGISTRATE JUDGE

 Presently before this Court is a *pro se* petition for writ of habeas corpus filed, pursuant to 28

U.S.C. § 2254, by a state prisoner.  He is currently incarcerated at SCI-Somerset.  He was sentenced

to a twenty-four (24) to forty-eight (48) year sentence for Involuntary Deviate Sexual Intercourse,

Indecent Assault, and Sexual Abuse of Children.   For the reasons that follow, it is recommended

that the within habeas petition be denied and dismissed without an evidentiary hearing.

## I. BACKGROUND[1]

 The background of this case was set forth by the Court of Common Pleas of Lancaster

County as follows:

> On February 17, 1998, [Petitioner's] parole agent, Barry Stephens, was notified by police in Schaefferstown, Pennsylvania, that a local couple had reported that [Petitioner] had had contact with and taken photographs of their eleven year old son.  Upon speaking with these parents, the parole agent was furnished with a number of photographs of [Petitioner] and their son. One of the special conditions of [Petitioner's] parole was not to have contact with or associate with minors under the age of eighteen for any reason.
>
>  The next day [Petitioner] was arrested at work by Agent

---

[1]In preparing this Report and Recommendation, I have reviewed Mr. Weiler's Petition for Writ of Habeas Corpus and supporting brief; the Commonwealth's answer to the petition, inclusive of all exhibits thereto; Petitioner's response to the Commonwealth's answer; his affidavit and other correspondence to the court, and the state court record.

Stephens for having violated his parole conditions[2] by having contact with a minor.  While being transported to his home, [Petitioner] admitted to having contact with minors.  The parole agent seized sexually explicit photographs of minors from [Petitioner's] residence which [Petitioner] admitted possessing.  At some point between the time these photographs were observed and when [Petitioner] was taken to the county prison, [Petitioner] volunteered information that he had engaged in sexual contact with the boy pictured in some of the photos.

Four days later [Petitioner] was Mirandized and questioned at the county prison by a Pennsylvania state police trooper who had been assigned to [Petitioner's] case by his superior officer, whom the parole agent had notified.  Notwithstanding his having signed a request for the appointment of a lawyer upon his arrival at the prison on February 18, 1998, [Petitioner] signed the Pennsylvania State Police rights waiver form waiving his Miranda rights.  During this interview [Petitioner] admitted to sexual contact with minors.  On March 16, 1998, a search warrant was executed at [Petitioner's] premises and other potential evidence was seized.   On March 23, 1998, an arrest warrant was signed charging [Petitioner] with involuntary deviate sexual intercourse and other related crimes.

*Commonwealth v. Weiler*, No. 2304 of 1998, slip op. at 1-2 (C.C.P. Lancaster County, October 26,

1999). Mr. Weiler moved to suppress various items of evidence, and the Court of Common Pleas

denied this motion. *Id.* at 1.  After a nonjury trial before the Honorable Michael J. Perezous, Mr.

Weiler was found guilty on all counts and sentenced to ten (10) to twenty (20) years for IDSI; one

(1) to two (2) years on each count of Indecent Assault; 2 ½ to five (5) years for Corruption of

Minors; and 3 ½ to seven (7) and five (5) to ten (10) years on the two (2) counts of Sexual Abuse

of Children.  These sentences were imposed consecutively for an aggregate term of imprisonment

of 24 - 48 years. *Id.*  Mr. Weiler filed a timely post-sentence motion in which he "challenge[d] the

imposition of separate sentences for each offense on the basis of the merger of the lesser offenses

---

[2][Petitioner] was serving the parole portion of a five to fifteen year sentence for Involuntary Deviate Sexual Intercourse.

(Indecent Assault, Corruption of Minors and Sexual Abuse of Children) into the more serious offense of IDSI". *Id.* at 2. The court denied this motion.

Mr. Weiler appealed his judgment of conviction to the Superior Court of Pennsylvania, raising the following issues:

> 1. Did the Lower Court err in it's [sic] finding that Parole Agent Stephens did not violate [Petitioner's] Constitutional Rights against self-incrimination?
>
> 2. Did the Lower Court err when it found that Parole Agent Stephens did not violate [Petitioner's] Constitutional Rights against illegal search and seizure?
>
> 3. Did the Lower Court err in failing to suppress [Petitioner's] statements to State Police Officer Shirk?
>
> 4. Is the Lower Court's sentence illegal in that it failed to merge lesser included offenses?

*Commonwealth v. Weiler*, 959 MDA 2000, slip op. at 1-2 (Pennsylvania Superior Court, May 21, 2001). On May 21, 2001, the Superior Court affirmed Mr. Weiler's conviction and sentence in part, and vacated the portion of his conviction and sentence pertaining to the corruption of a minor. The Court opined: "Although the basis for the corruption of minors conviction is 'a variety of sexual acts between January and February of 1998', it is clear that these acts concern three incidents for which [Petitioner] was otherwise charged with a sex offense, convicted and sentenced". *Id.*, at 24-25. The Court vacated Mr. Weiler's sentence of 2 ½ to five (5) years of imprisonment for his corruption of minors conviction. *Id.* at 25. Because Mr. Weiler failed to file a timely petition for allowance of appeal to the Supreme Court of Pennsylvania, his conviction initially became final on June 21, 2001.

Over three and a half years later, on February 15, 2005, Mr. Weiler filed an Application for Reargument *Nunc Pro Tunc* in the Superior Court of Pennsylvania. In support of his application,

3

Mr. Weiler  averred that his counsel, Mr. Joseph A. Ratasiewicz, Esquire, "failed to respond to [Petitioner's] numerous requests concerning the status of said appeal," and that Mr. Weiler learned of the Superior Court's judgment only through direct correspondence with the court on October 9, 2004.  *See* Answer, Exhibit F.  The Superior Court denied this Application for Reargument in a *Per Curiam* order issued April 8, 2005.  *Id.*, Exhibit G.

On June 5, 2005, Mr. Weiler filed a petition for collateral relief under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa.C.S. §9541, *et seq.*  With the help of an appointed attorney, Mr. Weiler filed an amended PCRA on September 26, 2006, alleging ineffectiveness of counsel. After an evidentiary hearing held on November 20, 2006, the PCRA court issued an order finding that Mr. Weiler did not receive proper notice of his right to petition the Pennsylvania Supreme Court for allowance of appeal until October 9, 2004.  On November 21, 2006, the court granted Mr. Weiler leave to file a petition *nunc pro tunc*, which he did on December 15, 2006, raising the following issues:

> A.   Whether the superior Court erred when it held that the [Petitioner's] parole agent did not violate his constitutional right against self-incrimination?
>
> B.   Whether the Superior Court erred when it found that the [Petitioner's] parole agent did not violate his constitutional rights with an illegal search and seizure?
>
> C.  Whether the [Petitioner's] statement to the police should have been suppressed when it was obtained after he had exercised his rights under the Fifth and Sixth Amendments to the United States Constitution?
>
> D.  Whether separately imposed consecutive sentences for indecent assault, sexual abuse of children and involuntary deviate sexual intercourse were illegal and in violation of the merger doctrine?

4

The Supreme Court of Pennsylvania denied this petition on June 14, 2007.  See Commonwealth *v. Weiler*, 926 A.2d 974 (Pa. 2007) (table).

On April 21, 2008, Mr. Weiler signed and dated the instant habeas petition, and it was filed in this Court on April 28, 2008.[3]  Mr. Weiler raises the following claims as a basis for granting habeas relief:

> A.   Ground one: [Petitioner's] constitutional rights were violated against self-incrimination, when parole agent questioned [Petitioner].
>
> B.   Ground two: Parole agent violated [Petitioner's] constitutional rights, against an illegal search and seizure.
>
> C.   Ground three: Suppression of [Petitioner's] statements to the police, under his Fifth and Sixth Amendment rights to have counsel present at questioning.
>
> D.   Ground four: [Petitioner's] seperately [*sic*] imposed consecutive sentences were illegal, and in violation of the Merger Doctrine.

Petition at 9.  The Commonwealth denies that Mr. Weiler is entitled to federal habeas corpus relief because two (2) of Petitioner's claims are not cognizable in federal habeas review, and the Pennsylvania Superior Court's decision in regard to the remaining claims was not contrary to or an unreasonable application of federal law.  *See* Supplemental Memorandum in Support of Answer.

## II. <u>DISCUSSION</u>

### A. <u>Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA or the Act), signed into law on April 24, 1996, significantly amended the laws governing habeas corpus petitions.

One of the amended provisions, 28 U.S.C. §2244(d), imposes a one-year statute of limitations

---

[3]Pursuant to the prison mailbox rule, I will accept the earlier date, April 21, 2008, as the date of filing.  *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998).

on state prisoners who seek federal habeas relief. A habeas petition must be filed within one year from the date on which the petitioner's judgment of conviction becomes final. *See* 28 U.S.C. §2244(d)(1).[4]

In applying the one-year statute of limitations to convictions which became final before the AEDPA was signed into law, the Third Circuit has held that habeas petitions filed on or before April 23, 1997, may not be dismissed for failure to comply with §2244(d)(1)'s time limit. *See Burns v. Morton*, 134 F.3d 109, 111 (3d Cir. 1998).

In the instant case, the Superior Court of Pennsylvania affirmed Mr. Weiler's convictions on May 21, 2001. Mr. Weiler's time for seeking *allocatur* in the Pennsylvania Supreme Court originally expired on June 21, 2001. *See* Pa.R.App.P. 1113(a) (petition for allowance of appeal shall be filed within thirty days from the entry of the order of the Superior Court sought to be reviewed). However, the PCRA court found that Mr. Weiler did not receive proper notice of his right to seek *allocatur* until he inquired with Pennsylvania's Superior Court on October 9, 2004. The court therefore reinstated Petitioner's right to file a petition for allowance of appeal with the Pennsylvania Supreme Court on November 21, 2006, and Mr. Weiler exercised that right on December 15, 2006. The Pennsylvania Supreme Court denied him *allocatur* on June 14, 2007. Consequently, his conviction became final on September 12, 2007, which is the last date on which he could have filed

---

[4] While the date on which the petitioner's conviction becomes final is typically the start date for the limitations period the statute permits the limitation period to run from four other points of time, depending on which occurs latest. In addition to the date on which the petitioner's conviction becomes final, the start date can also run from: (1) "the date on which the impediment to filing an application created by state action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action"; (2) "the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review"; or (3) "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence".

a timely direct appeal to the United States Supreme Court. *See* Rule 13 of the Rules of the Supreme Court of the United States, which provides a ninety-day appeal period after a judgment by the state court of last resort.[5]  Mr. Weiler  filed the instant Petition for Writ of Habeas Corpus on April 21, 2008, about seven  months after his judgment of conviction became final.  Because Mr. Weiler filed the instant petition within the one-year statue of limitations, the petition is timely.

### B.  **Exhaustion/Procedural Default**

The exhaustion rule, codified in 28 U.S.C. § 2254[6], requires a federal court to postpone habeas corpus jurisdiction, absent exceptional circumstances, until "the applicant has exhausted the remedies available in the courts of the State".   The exhaustion requirement is rooted in considerations of comity; the statute is designed to protect the role of the state court in enforcement of federal law and to prevent disruption of the state judicial proceedings. *Rose v. Lundy*, 102 S.Ct.

---

[5]There is nothing in the record that would call for the use of one of the other start dates provided in 28 U.S.C. §2244(d)(1).  There was no impediment to filing an application created by State action in violation of the Constitution or laws of the United States which prevented Mr. Weiler from filing a habeas petition.  No new constitutional right has been asserted, and at no later date was the factual predicate of the claims presented discovered.

[6]The exhaustion requirements of 28 U.S.C. § 2254 provide:

(b)(I) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that:

     (A) the applicant has exhausted the remedies available in the courts of the State; or
     (B)(I) there is an absence of available State corrective process; or
       (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

1198,1203 (1982); *Castille v. Peoples*, 109 S.Ct. 1056, 1059 (1989).

In order to demonstrate compliance with the exhaustion requirement, a habeas petitioner must show that each claim which forms the basis of his federal habeas petition has been "fairly presented" to the State courts. *Castille*, 109 S.Ct. at 1060; *Picard v. Connor*, 404 U.S. 270, 275 (1971). Absent exceptional circumstances, Petitioner must first present all of his constitutional claims in the state system, through the highest state tribunal, before seeking relief in federal court. *See Picard*, 404 U.S. at 275 (1971); *Swanger v. Zimmerman*, 750 F.2d 291 (3d Cir. 1984). The burden is on the habeas petitioner to establish that he has fairly presented his federal constitutional claims (both facts and legal theory) to all levels of the state judicial system. *Gattis v. Snyder*, 278 F.3d 222, 231 (3d Cir. 2002) (*quoting Evans v. Court of Common Pleas*, 959 F.2d 1227, 1231 (3d Cir. 1992), *cert. petition dismissed*, 506 U.S. 1089 (1993), "[b]oth the legal theory and the facts underpinning the federal claim must have been presented to the state courts . . . and the same method of legal analysis must be available in the state court as will be employed in the federal court.").

An unexhausted habeas claim becomes procedurally defaulted when the petitioner has no additional state remedies available to pursue the issue. *See Wenger v. Frank*, 266 F.3d 218, 223-24 (3d Cir. 2001), *cert. denied*, 122 S.Ct. 1364 (2002) (when a claim has not been fairly presented to the state courts, but further state-court review is clearly foreclosed under state law, the claim is procedurally defaulted and may be entertained in a federal habeas petition only if there is a basis for excusing the procedural default).

Procedural default also occurs when an issue is properly asserted in the state system but is not addressed on the merits because of an independent and adequate state procedural rule. *See Sistrunk v. Vaughn*, 96 F.3d 666, 673 (1996) and *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir.

1999) ("If the final state court presented with a federal claim refuses to decide its merits based on an established state rule of law independent of the federal claim and adequate to support the refusal, federal habeas review is foreclosed unless there is cause and prejudice or a showing of innocence.")

Procedural default may be excused if the habeas petitioner can show "cause" for the default and "prejudice attributable thereto", or demonstrate that the failure to consider his habeas claim will result in a "fundamental miscarriage of justice". *Wenger*, 266 F.3d at 224 (3d Cir. 2001). *See also McCandless*, 172 F.3d at 260 (3d Cir. 1999).

Here, Mr. Weiler raises the same four issues that he raised in the Superior Court of Pennsylvania, and upon which he petitioned the Supreme Court of Pennsylvania for allowance of appeal.  He adds a new factual allegation and legal argument to his merger claim, namely that because his trial judge was partial, he is entitled to have his conviction set aside.  Affidavit, 8/18/2006, at 14; Letter, 11/8/2008. Mr. Weiler also alleges new facts surrounding the circumstances of his admissions, namely that a physical illness led him to falsely incriminate himself while in custody.  Affidavit, 8/18/2006, at 7.  Because Mr. Weiler did not fairly present these facts and arguments to the courts of Pennsylvania, they have been procedurally defaulted. The remainder of Mr. Weiler's claims have been properly exhausted, and habeas corpus jurisdiction over them is therefore proper.

### C.  Merits

### 1.  Standard of Review

Because Mr. Weiler's habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), the amended habeas standards apply to his exhausted claims.

AEDPA precludes habeas relief on "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d) (Supp. 1998).

In interpreting the above language, the Third Circuit has discussed the appropriate degree of deference which AEDPA requires a federal habeas court to accord a state court's construction of federal constitutional issues and interpretation of Supreme Court precedent. *See Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3d Cir.), *cert. denied,* 120 S.Ct. 73 (1999). The Third Circuit has held that under 28 U.S.C. § 2254(d)(1), a two-step inquiry is warranted. The majority agreed that:

> (1) First the federal habeas court must determine whether the state court decision was "contrary to" Supreme Court precedent that governs the petitioner's claim. Relief is appropriate only when the petitioner shows that "Supreme Court precedent requires an outcome contrary to that reached by the relevant state court".

> (2) In the absence of such a showing, the habeas court must then ask whether the state court decision represents an "unreasonable application" of Supreme Court precedent. This inquiry is an objective one, namely, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified."

*Matteo*, 171 F.3d at 891 (3d Cir. 1999).

The United States Supreme Court has set forth the scope of habeas review after AEDPA.

10

*See Williams v. Taylor*, 120 S.Ct. 1495, 529 U.S. 362 (2000).  According to the *Williams*' majority:

> We [the Supreme Court Justices] all agree that state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated. [. . .] In sum, the [AEDPA] statute directs federal courts to attend every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law.  If, after carefully weighing all the reasons for accepting a state-court's judgment, a federal court is convinced that a prisoner's custody-or, as in this case, his sentence of death-violates the Constitution, that independent judgment should prevail.

*Williams*, 120 S.Ct. at 1511 (2000).

Under AEDPA, a federal reviewing court must presume that factual findings of state trial and appellate courts are correct.  The presumption of correctness may only be overcome on the basis of clear and convincing evidence to the contrary.  *See Stevens v. Delaware Correctional Center, et al.,* 295 F.3d 361, 368 (3d Cir. 2002).

## 2. The Fifth Amendment Claim

The first issue presented is whether Parole Agent Stephens violated Mr. Weiler's constitutional rights against self-incrimination either at Mr. Weiler's residence, or in the patrol car en route to the Lancaster County Prison.  At trial, Mr. Weiler moved to suppress essentially all statements he made to Agent Stephens and all physical evidence that followed these statements. He argued that this evidence is the product of an unmirandized custodial interrogation of Mr. Weiler. The Lancaster County Court of Common Pleas  denied this motion, and the Pennsylvania Superior Court affirmed.   As the Superior Court explained:

> The necessity of *Miranda* warnings arises only if the defendant is both in custody and under interrogation.  At the suppression hearing, Agent Stephens conceded that he never gave

[Petitioner] the *Miranda* warnings.  Additionally, there can be no question that [Petitioner] was "in custody" following his arrest for the parole violation.  However, there is no evidence that Agent Stephens interrogated [Petitioner].

The suppression court concluded that [Petitioner's] statements to Agent Stephens were voluntary, and the suppression testimony of Agent Stephens amply supports this conclusion.  Agent Stephens testified that, on the day of the arrest, he and another parole agent first went to [Petitioner's] residence and did not find him there.  The agents then proceeded to [Petitioner's] place of employment and "took him into custody".  According to Agent Stephens, [Petitioner] was advised that he was being arrested for violating a condition of his parole, contact with a minor child.  At that time, Agent Stephens also advised [Petitioner] that he and Agent David Milligan would be searching [Petitioner's] residence, that he had "probable cause to believe that there may be additional pictures or other paraphernalia or information at his residence", and that [Petitioner] would accompany them to the residence.  In particular, Agent Stephens testified that he would be looking for the original photographs of [Petitioner] and the eleven-year-old boy.

After entering the home with [Petitioner], Agent Stephens, as part of his standard practice, informed [Petitioner] that they were going to search and did not "want to destroy the place".  The agent then testified that he asked [Petitioner] "[i]f there is any type of materials here, you know what we're looking for.  We're looking for pictures, we're looking for magazines, videotapes, . . . please tell us where they are or we will conduct a thorough search and we're going to mess the place up."  Agent Stephens testified that [Petitioner] told them he would show them where such materials were.  He then took the agents to his bedroom and opened the closet door.  Inside the closet were large boxes with an "enumerable number of pictures of children and videotapes and magazines, etc."  Agent Stephens explained that, even without [Petitioner's] assistance, he would have eventually found the boxes because "oftentimes sex offenders will hide their stash right within the bedroom so that they can have it for themselves for any masturbatory purposes."

Agent Stephens testified that, as he and Agent Milligan began to take the photographs out of the boxes, "[Petitioner] was saying, well, some of these are old photographs prior to his parole and others are new photographs of children that have been taken after . . . he had

been placed on parole."   When asked if he was eliciting these statements from [Petitioner] or whether they were spontaneous on [Petitioner's] part, Agent Stephens testified that [Petitioner] "was just explaining to us at that point."   When asked about the photographs of the victim in this case, Agent Stephens testified that those pictures stood out from the rest because the boy depicted thereon was nude and obviously under the age of eighteen.   Agent Stephens testified that these pictures were "pointed out to us by [Petitioner] . . .  He said, I believe this is what you're looking for."   When asked if there was any dialogue subsequent to [Petitioner] pointing out the pictures of the victim, Agent Stephens testified that [Petitioner] "gave us the [victim's] name, who it was, and he was rather upset and at that particular time he started indicating to myself and Agent Milligan that, you know, he had just gotten his stash of photographs a couple of months before and that the addiction was starting to overcome him again and he was starting to do things he wasn't proud of."   Agent Stephens testified that [Petitioner] further informed them that "[the victim and his family] lived in the trailer park at some point and everything.   He had moved – he had helped them move, that the parents didn't pay much attention to the boy and that he sort of had befriended him."

Agent Stephens then reiterated that he and Agent Milligan were conducting a search of [Petitioner's] residence in order to determine to what extent [Petitioner] had violated his condition of parole regarding no contact with minors.   He testified that, at that point, he was not interested in whether [Petitioner] had any sexual contact with the victim because he "can't prosecute somebody for any type of new crime.   I'm a parole agent.   I can only – I am only authorized within the parameters of parole to enforce the violation of conditions."

According to Agent Stephens, after the search of [Petitioner's] residence was completed, Agent Milligan drove them toward the Lancaster County Prison.   Agent Stephens sat in the back of the vehicle with [Petitioner].   Agent Stephens testified that, on the way to the prison, [Petitioner] pointed out where the victim lived.   When asked the circumstances surrounding [Petitioner's] revelation, Agent Stephens testified that:

> As is my normal practice sitting back with a prisoner,
> I often talk to them because ofentimes I found out as
> a person approaches the prison a person gets more and

> more upset, and I was dialoguing with [Petitioner] and
> he indicated that – he was going on about how the
> addiction had started taking hold of him again and
> how bad he felt about this and how this was anathema
> to his religious convictions and he basically then said
> that he had performed fellatio on [the victim]. I
> believe the term he used was he sucked him.

Agent Stephens testified that he did not elicit this statement from [Petitioner] in any way. Agent Stephens then testified that [Petitioner] had told him that he "cared very much for [the victim] and he basically at that point wanted to make certain that the young man got some treatment [because he had] gone through similar difficulties as a young person, and he was very concerned for [the victim's] welfare at that point."

Agent Stephens further testified that he then told [Petitioner] that he was a "mandated reporter'" and that he would have to report the incident to the county Children and Youth Services (CYS). Agent Stephens testified that, prior to this last statement by [Petitioner], he did not contemplate any new criminal charges being filed against [Petitioner]. Finally, Agent Stephens testified that [Petitioner] at no time during his arrest and the search of his residence expressed a desire not to speak to him.

Upon cross-examination, Agent Stephens testified that he handcuffed [Petitioner] when he arrested him and that [Petitioner] remained handcuffed while being transported to his residence. Once at the residence, [Petitioner's] handcuffs were removed. According to Agent Stephens, during the twenty-minute ride to [Petitioner's] residence, they "were talking about the arrest and the fact [the parole agents] were going to search" his residence "for photographs and any other material." Agent Stephens further testified that he and [Petitioner] first began talking about [Petitioner's] arrest once they were inside his vehicle. He also testified that he contacted CYS the next day regarding [Petitioner's] admission of sexual contact with the victim and was told that, because a "custodial situation" was not involved, he would have to contact the local authorities. According to Agent Stephens, he then contacted Corporal Raymond Guth, a criminal investigator with the Pennsylvania State Police. Agent Stephens relayed the information to Corporal Guth and showed him the pictures of the victim. A week to ten days later Trooper William Shirk contacted him. Agent Stephens testified that he informed

14

Trooper Shirk of what [Petitioner] had said to him, showed him the pictures, and gave him the name, address and phone number of the victim – all information [Petitioner] had given him.

When asked about whether he had questioned [Petitioner] at his residence, Agent Stephens testified that, as he and Agent Milligan looked through the pictures, he asked [Petitioner] "where and when the contact with these kids [occurred], which [were] old pictures, which [were] new pictures, . . . [and] when he took the pictures."

Upon redirect, Agent Stephens reiterated that he would not characterize his interaction with [Petitioner] on the day of [Petitioner's] arrest as "questioning," but rather "conversation." Upon recross, Agent Stephens denied questioning [Petitioner] the entire time it took to transport him from his work to his home and then to the county prison.  Rather, Agent Stephens explained that he asked his first question at [Petitioner's] residence and only in regard to the various pictures found in [Petitioner's] bedroom closet.  Agent Stephens testified that any such question was asked solely for the purpose of establishing that [Petitioner] "had had contact with children."

Given the totality of the circumstances detailed above, we conclude that the court below properly denied that part of [Petitioner's] suppression motion claiming that any and all statements he made were the product of a custodial interrogation occurring without first being informed of his *Miranda* rights.  Although Agent Stephens testified that he and [Petitioner] were conversing at different times, because [Petitioner] was upset following his arrest for the parole violation, the evidence, when properly viewed, does not indicate that an interrogation occurred but, rather, "merely general conversation, which is routinely attendant with a custodial relationship."

Moreover, as to Agent Stephens' inquiry as to the location of the pornographic material, even if the question was improper, Agent Stephens' testimony that he would have inevitably discovered them is sufficient to purge any illegality and allow its admission at trial.  Any statements made following the viewing of the pictures at [Petitioner's] residence were unsolicited, spontaneous remarks "volunteered" by [Petitioner] rather than the result of any interrogation by Agent Stephens.  On several occasions during his testimony, Agent Stephens testified that he did not elicit any

incriminating statements from [Petitioner], and [Petitioner], having presented no testimony at the suppression hearing, failed to contradict Agent Stephens.  Finally, at no time during his interaction with Agent Stephens did [Petitioner] invoke his right to remain silent or otherwise indicate in any way that he did not wish to speak with the parole agent.  Considering all of the above, we conclude that the court below properly denied [Petitioner's] attempt to suppress any and all statements made to Trooper Stephens.

*Commonwealth v. Weiler*, No. 959 MDA 2000, slip op. at 7-14 (Superior Court, May 21, 2001)

(internal citations omitted).

The Pennsylvania Superior Court applied the rule set forth in *Commonwealth v. Mannion*,

725 A.2d 196, 200 (Pa. Super. 1999):

A law enforcement officer must administer Miranda warnings prior to custodial interrogation. . . . Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission." When a person's inculpatory statement is not made in response to custodial interrogation, the statement is classified as gratuitous and is not subject to suppression for lack of warnings.

*Id.* at 6-7 (quoting *Mannion*, 725 A.2d at 200) (internal citations omitted).  The court's definition of

"custodial interrogation" was taken verbatim from *Miranda v. Arizona*, 38 U.S. 436, 444 (1966).

The court's definition of "interrogation" is similar to the definition set forth in *Rhode Island v. Innis*,

446 U.S. 291 (1980):

"[I]nterrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Innis*, 446 U.S. at 301.  The Pennsylvania Superior Court's holding regarding gratuitous statements

is consistent with the United States Supreme Court's holding in *Miranda*, which requires only the

16

suppression of statements made during custodial interrogations and in the absence of procedural safeguards such as *Miranda* warnings. *See Miranda*, 384 U.S. at 444. Therefore, the Pennsylvania Superior Court's decision on Mr. Weiler's Fifth Amendment claim was not "contrary to" Supreme Court precedent.

The Pennsylvania Superior Court suggested that where some of Mr. Weiler's statements may have been the product of improper questioning on the part of Agent Stephens, the inevitability doctrine purged this questioning of illegality. *See Commonwealth v. Weiler*, No. 959 MDA 2000, slip op. at 13-14. This result is consistent with the inevitability doctrine set forth in *Nix v. Willams*, 467 U.S. 431 (1984). Here, Agent Stephens' request that Mr. Weiler "tell us where the [pictures, magazines, videotapes, etc. etc.] are or we will conduct a thorough search and we're going to mess the place up," N.T. 8/27/99, at 28, was an improper, unmirandized custodial interrogation. However, in response to this request, Mr. Weiler revealed only the location of his picture collection–evidence that Agent Stephens inevitably would have found during a search of Mr. Weiler's residence authorized by Title 61 P.S. §331.27(a) and *Griffin v. Wisconsin*, 483 U.S. 868, 873-874 (1987). Therefore, the trial court did not violate Mr. Weiler's federal constitutional rights when it denied his motion to suppress the fruits of this interrogation.

The court held the remainder of Mr. Weiler's statements to be either voluntary or the product of "general conversation", rather than interrogation. *See Commonwealth v. Weiler*, No. 959 MDA 2000, slip op. at 13-14. This is despite testimony on the record that Agent Stephens expressly questioned Mr. Weiler at his residence, N.T., 8/27/99, 56, 59, and "dialogued" with him in the patrol car. *Id.* at 35. While this testimony suggests that Agent Stephens "interrogated" Mr. Weiler, the record as a whole does not compel that conclusion.

17

Under *Miranda*, custodial interrogation must be "initiated by a law enforcement officer." *Miranda*, 384 U.S. at 445.  Agent Stephens testified that as they went through the photographs found in Mr. Weiler's closet,  "Mr. Weiler was saying, well, some of these are old photographs prior to his parole and others are new photographs . . . ."  N.T. 8/27/99 at 28.  When asked whether he elicited these statements or whether they were spontaneous, Agent Stephens replied, "[Mr. Weiler] was just explaining to us at that point." *Id.* at 29.  Agent Stephens' testimony leaves the impression that Mr. Weiler initiated this conversation with Agent Stephens.  Mr. Weiler failed to contradict this impression, either on cross-examination or through testimony on his own behalf.  Because Mr. Weiler, and not Agent Stephens, apparently initiated this conversation, Mr. Weiler apparently was not under custodial interrogation when he made the incriminating statements.  Therefore, Mr. Weiler has not "firmly convinced" us that his constitutional right to *Miranda* warnings incident to custodial interrogation was violated in this instance.

Finally, Mr. Weiler has argued that incriminating statements he made to Agent Stephens while in the back seat of his patrol car should have been suppressed as the product of an unmirandized custodial interrogation. Under *Innis*, an "interrogation" is words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Innis*, 100 S.Ct. at 1689-90.  Here, Mr. Weiler's incriminating statements arose from a "dialogue" that took place between him and Agent Stephens while en route to the Lancaster County Prison. N.T. 8/27/99, at 35.  The record does not indicate the particular words or actions on the part of Agent Stephens that are said to have elicited Mr. Weiler's incriminating response.  It is therefore impossible to determine whether such words or actions constituted "interrogation" under *Innis*.  Therefore, Mr. Weiler has not "firmly convinced" us that his constitutional right to *Miranda*

18

warnings incident to custodial interrogation was violated in this instance, either.

The decision of Pennsylvania's Superior Court was neither contrary to, nor an unreasonable application of, U.S. Supreme Court precedent.  Federal habeas corpus relief is not warranted for this claim.

### 4. The Fourth Amendment Claim

In his second claim, Mr. Weiler asserts that his Parole Agent violated his constitutional right to be free of illegal search and seizure when he searched Petitioner's residence.

"Where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone v. Powell*, 428 U.S. 465, 494 (1976), accord *Marshall v. Hendricks*, 307 F.3d 36, 81-82 (3rd. Cir 2002).  The Superior Court of Pennsylvania opined:

> In 1995, the General Assembly passed two statutory provisions authorizing searches of a parolee by state and county parole officers. *See* 61 P.S. §§331.27a & 331.27b.  Pursuant to the express terms of these provisions, evidence discovered following a parole agent's search shall not be suppressed if the parole agent has a reasonable suspicion that a parolee has violated the conditions of his or her parole.  While conceding such authority, [Petitioner] argues that Agent Stephens did not have to search his residence in order to determine whether a parole violation had occurred because the parole agent already had in his possession a photograph of [Petitioner] embracing an eleven-year-old boy, "the very evidence needed to verify [Petitioner's] non-compliance." [Petitioner's] Brief at 12.  We cannot agree.
>
> A warrantless search will be deemed reasonable if the totality of the circumstances demonstrates that a parole officer had reasonable suspicion that the parolee had committed a violation of parole and that the search was reasonably related to the parole officer's duties. *Commonwealth v. Van Rice*, 721 A.2d 1119, 1120-21 (Pa. Super.

1998).  Section 331.27a(2) provides that "[a] property search may be conducted by any agent if there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision."  61 P.S. §331.27a(2).  Thus, in the present case, Agent Stephens was statutorily authorized to search [Petitioner's] residence in order to determine whether there was additional evidence of parole violations committed by [Petitioner]. *See also Commonwealth v. Green*, 591 A.2d 1079, 1084 (Pa. Super. 1991) (explaining that, in order to make a proper decision whether the defendant was a "good parole risk", the parole officer needed to know the number and seriousness of the violations).

[Petitioner] also argues that the search was unreasonable because section 331.27a(3) mandates that "[p]rior approval of a supervisor shall be obtained for a property search absent exigent circumstances."  He then argues that no such exigencies existed, Agent Stephens did not testify that he had gained such approval, and the Commonwealth did not introduce any exhibit indicating that Agent Stephens' supervisor gave the approval.  This claim requires little discussion.  Agent Stephens did testify that he sought and obtained approval for both [Petitioner's] arrest and the search from his supervisor.  *See* N.T. 8/27/99, at 22.  Moreover, section 331.27a© further provides that "[n]o violation of this section shall constitute an independent ground for suppression of evidence in any probation/parole or criminal proceeding."  Thus, [Petitioner's] claim is refuted by the record and otherwise without merit.

*Commonwealth v. Weiler*, No. 959 MDA 2000, slip op. at14-16.

Mr. Weiler's Fourth Amendment claim clearly received full and fair litigation at the suppression hearing, and again on appeal to the Superior Court of Pennsylvania.  *See* Answer, Exhibits A, E.  This Court may not grant Mr. Weiler federal habeas corpus relief on this claim.

**5. The Fifth/Sixth Amendment Claim**

In his third claim for habeas relief, Mr. Weiler alleges that his Fifth and/or Sixth Amendment rights were violated.  He states that he executed a "Petition for Appointment of Free Legal Counsel" upon his incarceration; however, he did not have counsel present when he was questioned by the

police.  Petition at 9.  Mr. Weiler, thus, attempts to gain suppression of his statement through a combination of the Sixth Amendment right to counsel and *Miranda*'s Fifth Amendment right to counsel.

As explained by the Supreme Court of the United States in *McNeil v. Wisconsin*, 501 U.S. 171 (1991):

> The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." In *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), we held that once this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective.
>
> . . . . .
>
> The Sixth Amendment right, however, is offense specific.  It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, "'at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"
>
> . . . . .
>
> . . . Petitioner [also relies] upon a different "right to counsel," found not in the text of the Sixth Amendment, but in this Court's jurisprudence relating to the Fifth Amendment guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), we established a number of prophylactic rights designed to counteract the "inherently compelling pressures" of custodial interrogation, including the right to have counsel present.  *Miranda* did not hold, however, that those rights could not be waived.  On the contrary, the opinion recognized that statements elicited during custodial interrogation would be admissible if the prosecution could establish that the suspect "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.*, at 475, 86 S.Ct. At 1628.
>
> In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), we established a second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not

only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him."  451 U.S. at 484-485, 101 S.Ct., at 1884-1885- which means, we have most recently held, that counsel must be present.

. . . . .

The *Edwards* rule, moreover, is *not* offense specific.  Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present.  *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

. . . . .

The purpose of the Sixth Amendment counsel guarantee-and hence the purpose of invoking it-is to "protec[t] the unaided layman at critical confrontations" with his "expert adversary," the government, *after* "the adverse positions of government and defendant have solidified" with respect to a particular alleged crime.  *Gouveia*, 467 U.S. at 189, 104 S.Ct., at 2298.  The purpose of the *Miranda-Edwards* guarantee, on the other hand-and hence the purpose of invoking it-is to protect a quite different interest: the suspect's "desire to deal with the police only through counsel," *Edwards, supra*, 451 U.S. at 484, 101 S.Ct., at 1884.  This is in one respect narrower than the interest protected by the Sixth Amendment guarantee (because it relates only to custodial interrogation) and in another respect broader (because it relates to interrogation regarding *any* suspected crime and attaches whether or not the "adversarial relationship" produced by a pending prosecution has yet arisen).  To invoke the Sixth Amendment interest is, as a matter of *fact*, *not* to invoke the *Miranda-Edwards* interest.

*McNeil*, 501 U.S. at 17578 (emphasis in original).

The Superior Court of Pennsylvania opined:

In the present case, [Petitioner] signed a request for an attorney to represent him with regard to his parole violations.  The court below specifically found as fact that this request related only to [Petitioner's] parole violation, *i.e.*, contact with young boys.  We have already determined that no custodial interrogation occurred prior to [Petitioner's] arrest, and there is no evidence of record that any interrogation occurred upon [Petitioner's] incarceration.  Thus, by signing the form requesting court-appointed counsel to represent him during the parole violation proceedings, [Petitioner], like the

defendant in *McNeil* and unlike the defendant in *Santiago*, sought legal assistance "from critical confrontations with the state apparatus that ha[d] been geared up to prosecute him: rather than any express desire for counsel "to counteract the inherent pressures of custodial interrogation." *Santiago*, 528 Pa. at 521, 599 A.2d at 202.  As this Court has summarized:

> To invoke the Sixth Amendment interest is, as a matter of fact, not to invoke the *Miranda-Edwards* interest.  One might be quite willing to speak to the police without counsel present concerning many matters, but not the matter under prosecution.  It can be said, perhaps, that it is likely that one who has asked for counsel's assistance in defending against a prosecution would want counsel present for all custodial interrogation, even interrogation unrelated to the charge.  That is not necessarily true . . . But even if it were true, the likelihood that a suspect would wish counsel to be present is not the test for applicability of *Edwards*.   The rule of that case applies only when the suspect "ha[s] expressed" his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*.  *Edwards, supra*, 451 U.S., at 484, 101 S.Ct., at 1884 (emphasis added).   It requires, at a minimum, some statement that can be reasonably construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. . . .
> . . . . .
> [The U.S. Supreme Court has] in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation" . . . . Most rights must be asserted when the government seeks to take the action they protect against.  The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

*Commonwealth v. Romine,* 682 A.2d 1296, 1300, 1302 (Pa. Super. 1996) (*en banc*) (*quoting McNeil*, 501 U.S. at 178, 182 n. 3).  *See*

*also Commonwealth v. Brhnshtein*, 547 Pa. 460, 475, 691 A.2d 907, 914 (1997) (explaining that the police were not precluded from questioning a murder suspect with regard to an uncharged offense, even though the defendant, who had initiated the contact, had invoked his Sixth Amendment right to counsel for the murder charge for which he was incarcerated).

In the alternative, [Petitioner] argues that even if he only invoked his Sixth Amendment right, which is offense-specific, the basis of the parole violation filed by Agent Stephens included contact with both the eleven-year-old boy and the fourteen-year-old victim and, therefore, his interview by Trooper Shirk was constitutionally tainted. We find no merit to this contention. At the suppression hearing, Agent Stephens recounted how [Petitioner] had befriended the victim, having helped he and his parents move into the trailer park. It was this contact with the boy, rather than the sexual activity, that formed part of the basis for the parole violation. Further, at the time of his request for the assistance of counsel with regard to the parole violation, no separate charges involving the victim had been filed against [Petitioner]. *See Commonwealth v. Laney*, 729 A.2d 598, 601 (Pa. Super. 1999), *appeal denied*, 561 Pa. 690, 751 A.2d 187 (2000) (explaining that the Sixth Amendment right to counsel "is easily invoked for a charged offense, but that invocation cannot extend to future uncharged crimes, unless they stem from the same incident.)". [Petitioner], therefore, voluntarily waived his *Miranda* rights and executed a valid *Miranda* waiver. Thus, any statements made to Trooper Shirk were admissible at trial.

Having found no merit to any contention raised by [Petitioner], we conclude that the court below properly denied his suppression motion.

*Commonwealth v. Weiler*, No. 959 MDA 2000, slip op. at 20-23.

It is evident that the Superior Court's decision with respect to this claim was neither contrary to nor an unreasonable application of United States Supreme Court precedent. Mr. Weiler is not entitled to federal habeas relief on this claim.

### 6. The Merger Claim

In his final claim, Mr. Weiler asserts that his separately imposed consecutive sentences were

illegal and in violation of the Merger Doctrine.

Challenges to a state trial court's sentencing decision are generally not cognizable unless it is shown that the sentence imposed is outside statutory limits or otherwise unauthorized by law. *Dennis v. Poppel*, 222 F.3d 1245, 1258 (10th Cir. 2000).  *See also Williams v. Nish*, 2007 WL 2852443 E.D.Pa., September 26, 2007 ("Sentencing is considered a matter of state criminal procedure, and does not fall within the bounds of federal habeas corpus review.  Thus, a federal court has no power to review a sentence in a habeas corpus proceeding unless it exceeds the statutory limits" (internal quotations omitted)).

Mr. Weiler was sentenced to the statutory maximum for each offense[7], and Pennsylvania law authorizes the sentencing court to impose these sentences concurrently or consecutively.  *See* 42 Pa.C.S.A. §9721(a).  Consequently, Petitioner's sentence was not "outside the statutory limits or unauthorized by law", and this claim is not cognizable in this forum.

## **RECOMMENDATION**

For the reasons set forth above, it is recommended that the Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. §2254, be DENIED AND DISMISSED WITHOUT AN EVIDENTIARY HEARING.  It is further recommended that a finding be made that there is no probable cause to issue a certificate of apealability.

BY THE COURT:

 S/M. FAITH ANGELL
M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE

---

[7]The Superior Court of Pennsylvania subsequently vacated Mr. Weiler's sentence of two and one-half to five years of imprisonment for his corruption of minors conviction.  *See Commonwealth v. Weiler*, No. 959 MDA 2000, slip op. at 25 (Pa. Super. May 21, 2001).